UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Dory L., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 19 CV 50106 |
| ) | Magistrate Judge Iain D. Johnston |
| Andrew Saul, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

This case is fits into a category of cases sometimes referred to as retrospective diagnosis cases.[1] In these cases, a claimant who is suffering from a progressive impairment that is clearly documented at some later point in time argues that the impairment was also present earlier even though there is little or no contemporaneous medical evidence from that earlier time. To overcome the lack-of-evidence problem, a medical expert is called upon to draw a backward-looking inference as to what was the reasonably likely onset date. This inference is drawn by extrapolating from the "normal" progression of the impairment and relying on any other evidence, often including lay evidence, from the earlier period. SSR 83-20, which was in effect at the time of this case,[2] specifically authorizes this inferential approach, stating that when "adequate medical records are not available," it will be "necessary to infer" the onset date. SSR 83-20 further states that the ALJ "should" call a medical expert at the administrative hearing to determine whether such an inference can be made and also should "explore other sources,"

---

[1] *See* Carolyn A. Kubitschek and Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court*, p. 254 (2020 ed.) (§ 2:45 "Retrospective diagnosis").
[2] Effective October 2, 2018, SSR 83-20 was rescinded and replaced by SSR 18-1p and 18-2p.

1

including family and friends. The Seventh Circuit has endorsed this general analytical framework.[3] This argument is often used when claimants have trouble showing that they were disabled before the date last insured ("DLI"). That is the situation here. Plaintiff has Huntington's disease, an inherited neurological disorder causing a breakdown of nerve cells. In the words of plaintiff's expert, it is "inexorably progressive." R. 785. Plaintiff was not diagnosed with this condition until many years after her DLI. The ALJ concluded that there was no evidence confirming that plaintiff had this condition (or any other impairment) before this DLI, and therefore found plaintiff not disabled. The Court finds that this case must be remanded because the ALJ failed to consider the inferential approach contemplated by SSR 83-20 and the case law, failed to call a medical expert, and failed to fully or fairly analyze the record.

## BACKGROUND

Plaintiff filed her disability application in early 2015. Everyone seems to agree that she likely would have been found disabled at this time but for the DLI problem, although the ALJ made no such finding formally. The Commissioner, in the very first sentence of his brief, states that there is "little doubt" that plaintiff was suffering "significant symptoms" from Huntington's disease when she filed her disability application. But as the Commissioner further notes, the relevant question is whether plaintiff was disabled by December 31, 2008, which was her DLI. Although this initial formulation suggests a sizeable six-year gap, it is probably more accurate to say that it is really around six to nine months, as will be explained below.

---

[3] *See, e.g., Walker v. Berryhill*, 900 F.3d 479, 483 (7th Cir. 2018); *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) (remanding because ALJ improperly "rejected Dr. Matsakis's opinion regarding Allord's condition in the critical period on the ground that there must be contemporaneous medical evidence of the applicant's condition"); *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Where, as here, a claimant is found disabled but it is necessary to decide whether the disability arose at an earlier date, the ALJ is required to apply the analytical framework outlined in SSR 83–20 to determine the onset date of disability.").

To support her claim that she was disabled pre-DLI, plaintiff procured two medical opinions.[4] One was from Dr. Monica Simionescu, the neurologist who was treating plaintiff, and the other was from Dr. Julian Freeman, who did not treat plaintiff but who reviewed all her records. Dr. Simionescu's opinion is short and limited in scope, although still potentially relevant. Dr. Freeman's opinion is more ambitious. It is an 8-page, comprehensive opinion, containing a long chronological summary of the medical record, a summary that stands in contrast to the ALJ's minimal overview. Dr. Freeman, after summarizing the facts, set forth a detailed inferential argument as to why plaintiff was disabled before the DLI despite the lack of contemporaneous medical evidence. In this discussion, Dr. Freeman provided a prebuttal to some of the arguments the ALJ later relied on. In short, based on its length and level of analysis, this opinion appears to be a formidable piece of evidence.

Plaintiff was first diagnosed with Huntington's disease in 2015. Dr. Simionescu made the diagnosis, relying on genetic testing, which had not been done before. Earlier doctors had considered the possibility that plaintiff's symptoms, such as her shoulder tics, were caused by Huntington's disease. Specifically, in the summer of 2009, plaintiff at some point (the exact date is not clear) sought treatment with Dr. John Mueller, a family medicine doctor. Dr. Mueller then referred plaintiff to Dr. Mohammed Afzal, a neurologist, for an initial evaluation. Dr. Afzal noted that plaintiff had "significant involuntary movements" and walked with "a broad based gait" and had limited hand movement. R. 538. In the differential diagnosis section, Dr. Afzal listed "simple tics" and "imbalance" as the possible diagnoses. R. 539. He then referred plaintiff to Dr. Laura Buyan-Dent, a professor of neurology working at the University of Wisconsin's Movement Disorders Clinic.

---

[4] Plaintiff's daughter also testified about plaintiff's symptoms before the DLI.

3

Plaintiff saw Dr. Buyan-Dent for a single evaluation on September 18, 2009. After the evaluation, Dr. Buyan-Dent wrote a three-page letter to Dr. Afzal setting forth her opinion. She concluded that plaintiff's abnormal body movements were "benign dyskinesias with a likely psychogenic origin." R. 657. Here is the longer explanation:

> IMPRESSION: Dory [L.] is a 55-year-old woman with recent diagnosis of diverticulitis with recent exacerbation, history of hypertension, a long history of abnormal movements affecting her right shoulder and now more generalized abnormal movements. Her neurologic exam is essentially normal aside from these movements. The movements to my eyes look rather choreiform in nature, but they do not act like usual choreiform movements, meaning chorea usually will increase with distraction. I think that these are likely benign dyskinesias with a likely psychogenic origin. Her "baseline" abnormal movement in her right shoulder girdle certainly could be a form of a tic or just a benign dyskinesia having a history of that abnormal movement certainly could predispose her to more generalized abnormal movements in the form of a conversion reaction when she is under severe stress. Her otherwise normal neurologic exam is actually reassuring against neurodegenerative disorders such as Huntington's disease, or other secondary causes of chorea. Certainly, this could be an unusual tic disorder as well. However, her inability to find ways to volitionally suppress the movements points against that.
>
> I did discuss [all] this with her and she was actually quite receptive to a possible psychogenic cause to these movements. She did feel reassured after the evaluation. I do think this has a good prognosis for recovery in the long run. I would recommend aggressively treating her depression with medications as is being done as well as counseling. I would have the counseling focus on coping with her stress. I would not particularly focus on conversion reaction and focus on the abnormal movements. Certainly an MRI of her brain would be reassuring but at this point I agree that we do not need to obtain one urgently. To manage these abnormal movements, the Xanax certainly, has been helpful for benzodiazepines will help any type of abnormal movement. One may want to consider putting her on a longer acting benzodiazepine with less addictive potential such as clonazepam for the more long-term treatment. Additional options would be low dose Risperdal or olanzapine as well. Certainly pimozide is an option also but may predispose her to more tardive dyskinesias in the long run. I would recommend that once these movements have settled down and once they have been diminished for 6 months that one consider tapering her off the medications as well to see if she really needs them in the long one.

R. 657-58.[5]

At the time that plaintiff first began seeing Drs. Mueller, Afzal, and Buyan-Dent in the summer of 2009, it appears that she was already taking a series of psychiatric medications. In reading this fact in the record, the Court was somewhat puzzled because it was not clear exactly why this many medications had been prescribed and who prescribed them. The Court will return to this topic below.

On January 26, 2018, the administrative hearing was held. Plaintiff and her daughter testified, as well as a vocational expert. No medical expert was called.

On March 12, 2018, the ALJ found plaintiff not disabled. The ALJ's decision is just over six pages, shorter than most ALJ decisions. It does not contain the traditional chronological summary of medical visits. The ALJ also did not go through the full, five-step analysis because he found that none of plaintiff's alleged impairments qualified as severe impairments at Step Two. This determination is generally regarded as an easy-to-meet test. *See O'Connor-Spinner v. Colvin*, 832 F.3d 690, 697 (7th Cir. 2016) ("The Step 2 determination is 'a *de minimis* screening for groundless claims' intended to exclude slight abnormalities that only minimally impact a claimant's basic activities."). The two alleged impairments relevant for this appeal are Huntington's disease and psychological problems.[6] The ALJ analyzed these separately, apparently believing they were unconnected. In contrast, Dr. Freeman opined that that the psychological problems were caused by the Huntington's disease.

In finding that plaintiff did not have any medically determinable impairments, the ALJ relied heavily on the fact that there was no contemporaneous evidence to "corroborate" (the

---

[5] In making these diagnoses, Dr. Buyan-Dent did not have any test results or neuroimaging to review. She noted that Dr. Afzal was "holding off" on ordering such tests until plaintiff's movements were "more well controlled." R. 657.
[6] Plaintiff also suffered from hypertension, obesity, and diverticulitis. Because these impairments play no role in the current arguments, they will not be discussed here, but should be considered on remand.

5

ALJ's word) plaintiff's testimony. The ALJ noted that plaintiff only visited the doctor twice in this period. These were two routine gynecological visits, on November 2, 2006 and October 22, 2007. The gynecologist did not observe shoulder tics or any other symptoms at either visit.

In addition to noting the lack of evidence, the ALJ also relied on the fact that plaintiff, according to the ALJ, made an admission when she visited Dr. Bunyan-Dent. Here is how the ALJ described this rationale: "The claimant confirmed that she never sought or received medical care for this condition prior to her date of last insured status because 'it did not really interfere with anything' (Ex. 10F, p. 3)." R. 39.

The ALJ next evaluated Dr. Freeman's opinion. The ALJ rejected it for two main reasons. First, there was no contemporaneous evidence. Second, the more contemporaneous observations of Dr. Afzal and Dr. Buyan-Dent were more probative. Here is the full explanation:

> The claimant submitted a report from Julian Freeman, M.D., a non-examining, non-treating neurologist, who reviewed the medical evidence contained in the record. In this report, Dr. Freeman opined that the claimant's Huntington's disease met listing 11.17B as early as June 1, 2007. Of particular importance, Dr. Freeman qualifies this opinion by noting that an onset date is not explicitly identified in the medical data; but rather, was derived by inference. Again, the claimant's contemporaneous treatment notes in 2006 and 2007 do not demonstrate any neurological symptomology. Moreover, the claimant's treating neurologists Mohammed S. Afzal, M.D. and Laura J. Buyan Dent, M.D. [sic] with a tic disorder and choreiform disorder, respectively. These diagnoses were made in 2009, less than one year after the claimant's date of last insured status. As the claimant's treating neurologists, Drs. Afzal and Dent had the opportunity to examine the claimant, observe her actions and behaviors, and review her test results at a time directly contemporaneous to the alleged period of disability. For these reasons, their observations and findings have greater evidentiary value than the report produced 10 years later by a non-examining, non-treating neurologist, retained by the claimant.

R. 39-40 (internal citations omitted).

The ALJ next discussed plaintiff's depression. The ALJ first noted that the "first diagnosis of depression" in the record was made by Dr. Mueller on August 18, 2009. The ALJ

6

then stated that the "depression was controlled with the medication Citalopram." R. 40. This is the extent of the analysis.

Lastly, the ALJ gave three rationales for finding plaintiff's testimony not credible. The first was that plaintiff and her daughter testified inconsistently about when plaintiff first began using a cane and when her symptoms first emerged. The second was that Dr. Afzal's treatment notes from 2009 and 2010 showed that plaintiff's symptoms were "controlled" by taking Xanax and Clonazepam. R. 40. The third rationale, somewhat cryptic, consisted solely of the following sentence:

> Moreover, Dr. Dent's neurological exam noted that the claimant's abnormal movements were "suppressible and distractible during her neurologic exam, the movements would diminished [sic] when she was concentrating on an activity and they certainly did not increase with distraction" (Ex/ 1-F, p. 4).

R. 40. The ALJ did not further explain this statement. It arguably hints at a malingering rationale, but the Court is not exactly sure what either the ALJ or Dr. Buyan-Dent were suggesting.

## DISCUSSION

After reviewing the briefs and the record, the Court concludes that the ALJ's analysis was inadequate in several respects. The main problems were doctor-playing, cherry-picking, and failing to recognize that the onset date could be established through an inferential methodology.

We start with the latter problem. The ALJ made multiple references in the short opinion to the lack of contemporaneous evidence supporting plaintiff's position. The ALJ stated, for example, that there was generally no medical evidence to "corroborate" plaintiff's symptoms. R. 40. The ALJ's main reason for rejecting Dr. Freeman's detailed opinion was that it was "derived by inference" and failed to "explicitly" identify the onset date, all of which seems to be an attempt to implicitly impose a requirement that there be smoking-gun contemporaneous medical evidence. R. 39. But these statements raise doubt as to whether the ALJ recognized and

7

understood the very nature of the inferential argument, which pre-supposes that there is little or no contemporaneous medical evidence and that evidence from after the DLI may be used as part of the analysis. *See* SSR 83-20; *Walker v. Berryhill*, 900 F.3d 479, 483 (7th Cir. 2018) ("That a precise onset date is not established by the medical evidence does not doom a claim for disability."). This error was significant because the ALJ relied on the lack of contemporaneous evidence to justify not addressing the merits of any of Dr. Freeman's arguments.

A related problem is that the ALJ played doctor. There was no medical opinion supporting the ALJ's decision. The ALJ did not rely on the opinions of the State Agency opinions, and the Commissioner agrees that those opinions provide no support for the ALJ's position. Dkt. #21 at 8 n.4. There was no consultative examination. It is true that the ALJ gave weight to statements from Dr. Afzal and Dr. Buyan-Dent, but these doctors did not offer a formal opinion. More problematic, as discussed below, the ALJ cherry-picked from these notes to create a sanitized picture of plaintiff's condition. In sum, a medical expert should have been called.

As for the ALJ's heavy reliance on the two gynecological visits pre-DLI, this argument fails to acknowledge that there was a 14-month time gap between the second visit and the DLI. Thus, it is possible that plaintiff's symptoms were mild at the last visit, such that the gynecologist did not pick up on them, but then worsened over the next year to the point where they became disabling. The ALJ should have considered this possibility.[7]

This leads to another important but unexplored topic. It is true, as the ALJ noted, that plaintiff did not seek any treatment in the pre-DLI period. But the ALJ failed to consider possible explanations for this fact. *See generally Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can

---

[7] Also worth noting is that plaintiff later stated that her symptoms waxed and waned during this period.

8

undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for lack of medical care before drawing a negative inference"). SSR 83-20 specifically states that ALJs should try to obtain information from family and friends as to why there was no medical treatment. In this case, the ALJ did not have to look far to find a possible explanation. Plaintiff's daughter testified that she was close to her mother and saw her often over the relevant period. She was asked why her mother did not seek treatment earlier. She answered as follows:

> In my opinion, I just think that she didn't—didn't really maybe want to acknowledge maybe the movements because she had had them for so long that she didn't really think—I always—as I got older and I really started thinking about her and the movements I—I pertained it to like pent up stress and anxiety and depression that she wasn't dealing with. I think she came from a family that probably didn't communicate a lot about things and she didn't know how to do that. And if anyone tried to encourage her to do something different she got angry with us. So then it got to where, you know, I was really stepping around carefully because I didn't want to get into fights with her and stuff. And I just think that she was resilient and didn't really realize what was wrong with her. And at that time we had no idea that this was in our family.

R. 70-71. The statement suggests the possibility that plaintiff's psychological problems may have played a role in her decision not to go to the doctor. If true, then this would not an uncommon scenario. *See Lewis v. Astrue*, 2012 WL 5342669, \*7 (N.D. Ill. Oct. 25, 2012) ("Federal courts have long recognized that, in the context of mental illness, insight can play an important role in evaluating the claimant's credibility; and, by definition, a claimant with poor insight cannot be expected to understand the true nature of his impairments."). But the problem here is that the ALJ never acknowledged the daughter's testimony or otherwise considered these possibilities.

Another line of evidence ignored by the ALJ was Dr. Simionescu's opinion. She was a treating physician. The failure to consider a treating physician's opinion would seem to offer an easy basis to remand. The Commissioner does not deny that the ALJ failed to discuss this opinion, but argues that no error occurred because the opinion was not "related to the relevant

9

period." Dkt. #21 at 8. This argument is unpersuasive, and relies on the same misunderstanding discussed above about the nature of the inferential argument. Dr. Simionescu opined as follows:

> Dory has been under my care since June 16, 2015. I have since diagnosed her with Huntington Disease. Based upon reviewing previous medical records from both UW Madison and Dr. Afzal starting back in 2009, the symptoms she displayed during that time period were mostly related to her current diagnosis.

R. 780. Although this opinion cannot single-handedly establish plaintiff's claim, it could serve as a building block in a broader inferential argument. Dr. Simionescu opined that plaintiff's symptoms in the summer of 2009 were "mostly related" to her then-undiagnosed Huntington's disease. Although not stated directly, the gist of this statement seems to be that Dr. Simionescu believed that the two neurologists mis-diagnosed plaintiff. This was the same conclusion reached by Dr. Freeman. Given that the ALJ relied heavily on the statements of these two doctors to reject Dr. Freeman's opinion, Dr. Simionescu's letter is indisputably material to this analysis and therefore should have been addressed.

Another problem with the ALJ's opinion is that it relies on egregious cherry-picking. Consider the following assertion, which was quoted earlier: "The claimant confirmed that she never sought or received medical care for this condition prior to her date of last insured status because 'it did not really interfere with anything' (Ex. 10F, p. 3)." On the surface, plaintiff's statement appears to be a damaging and fairly contemporaneous admission. But the ALJ took the statement out of context. Here is a larger excerpt from which this snippet was taken:

> The patient reports that for 20 years or so since she was in her 30s, she had abnormal movements of her right shoulder. This would wax and wane[,] sometimes stress related. She never sought medical care for it as it did not really interfere with anything. ***However,*** *approximately 2 years ago she began to notice gradually increasing abnormal movements that were similar in nature to her right shoulder movements but spread throughout her body and **were more intense***.

R. 656 (bold and italics added). The ALJ basically stopped at the word "however." This is the equivalent of converting a complex "yes, but" statement into an unequivocal "yes" statement. However, as the longer quotation demonstrates, plaintiff clearly told Dr. Buyan-Dent that her problems began two years earlier, which would have been sometime roughly around September 2007, well before the DLI. This statement roughly matches up with her hearing testimony. Thus, rather than being a damaging admission, this statement is more consistent with plaintiff's theory than the ALJ's.

More broadly, the ALJ's decision rests on a skewed picture of the severity of plaintiff's condition in summer of 2009.[8] The ALJ's analysis gives the impression that plaintiff's problems were all psychological and that they were basically benign, being easily and effectively treated by taking a few psychiatric medications such as Xanax. In some ways, the issue of whether plaintiff had Huntington's disease at this time is a distraction. Even if the ALJ and the two neurologists were right that plaintiff did not have Huntington's disease at this time—and later evidence suggests that they were *not* right—then the question still remains whether plaintiff's symptoms still established some impairment, perhaps a psychological impairment, that met the "slight abnormality" standard at Step Two.

The ALJ did not fully consider the evidence pointing to serious health problems at this time. Dr. Afzal and Dr. Buyan-Dent both observed significant involuntary movements. These doctors noted that plaintiff reported a series of troubling issues, including involuntary body movements that were intensifying and spreading to other body parts, occasional falls, a great deal of fatigue, forgetfulness, and abnormal hand movements making it impossible to do cross-stitch

---

[8] It should be noted that the ALJ stated that this evidence, relating to the period six to nine months after the DLI, was "directly contemporaneous" to the "alleged period of disability." R. 40. The ALJ did not make any argument to the effect that there was a material change between the DLI and the summer of 2009. In other words, under the ALJ's analysis, the six-to-nine-month gap was not an issue.

11

any more. R. 537, 657. As for plaintiff's depression, Dr. Buyan-Dent advised that it should be "aggressively" treated with counseling and medications. Plaintiff was taking, or had taken, a series of psychiatric medications during this time, including Xanax, Lexapro, Citalopram, and Seroquel. R. 537, 656. The mere fact that doctors had prescribed these medications suggests that they had diagnosed her with *some* psychological impairment. All this evidence suggests that plaintiff's depression met the minimal Step Two standard. *See, e.g., O'Connor-Spinner*, 832 F.3d at 697 (the ALJ's determination that " 'major depression recurrent *severe*' isn't a severe impairment . . . strikes us as nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social occupational, or other important areas of functioning.'").

But there is potentially more. It is time to return to the puzzling question, noted earlier, of why plaintiff was already taking multiple psychiatric medications when she first began seeing the neurologists in the summer of 2009. A related question is what prompted plaintiff to seek treatment at this particular time given that she had not done so in the previous years despite allegedly suffering from similar symptoms. A possible answer to these questions is given in Dr. Freeman's summary of the medical history. He states that plaintiff was involuntarily placed in a psychiatric facility for eight days at the end of June of 2009. Here is Dr. Freeman's summary:

> In 6/09, ER admission occurred at police request, in the setting of family dispute between the individual and her husband (SA 6/23/09, Dr. Longano). Auditory *hallucinations* also were reported at the time (ED visit admission statement) with diagnostic impression of hallucinations, *violence*, and *depression*. This was followed by psychiatric admission, lasting from 6/23/09 through 7/1/09 (discharge summary, Dr. Givens, SA records). Treatment included lexapro, but at time of discharge, mood lability and irritability continued (discharge summary p.2). The admission note (Dr. Givens) provides more detail, noting family history of depression with 2 suicides in the family, and a tic disorder. Major depression was the main diagnosis. Involuntary tics were noted on clinical exam (admission history and physical p.2 by Dr. Sizziqui, 6/23/09). Summary of activities prior to

12

> admission noted a major decline in function "she cannot function at all . . . "
> (Crisis intervention, p. 1, Penny Powers).

R. 782 (emphasis in original). Later in his opinion, Dr. Freeman surmised that Dr. Buyan-Dent missed the "obvious" diagnosis of Huntington's disease and "mis-interpreted" plaintiff's symptoms as a "psychomotor disorder" because the mental problems were "so marked as to 'misdirect' [her] thought processes." R. 789.

At the hearing, plaintiff's daughter testified about a similar incident, likely the same incident, although it is not entirely clear because there appeared to be some confusion about the date of this incident. Here is the relevant portion of her testimony:

> Q   And there was a hospitalization I believe in late June 2008, do you remember that?
>
> A   Yeah.
>
> Q   What led to that hospitalization?
>
> A   The profound anger that she had towards my dad specifically. I just think that she—she didn't—she couldn't deal with any of the emotions she was going through. She—I don't think she was on the right medications. She—I know she wasn't. She was so depressed and just overwhelmed with life. We couldn't—there was nothing that we could do or she could do that she would not be overwhelmed with. So finally one day it was—it had been going on a little bit and she had tried to start my dad's motorcycle on fire, and she had thrown his CPAP machine down the stairs. She—I think she had—from my recollection there was a knife involved at one point that she had threatened him with. She was just throwing his things all over the house. And so I had called the doctor, Mueller, because she had just started seeing him and he had given her these medications and stuff. And I think—and I will give my mom huge kudos that through the years she never became—sorry—a drug addict or an alcoholic.
>
> Q   Okay.
>
> A   So anyways she was taking these meds and she wasn't probably taking them completely correct because she didn't really want to take them but yet they gave her relief. And so anyway so I called that Dr. Mueller and I said to him that something needs to happen, that we have to get her help. So that is when my brother and I were out in the front and the police were actually down the street for some other reason. And he seen my brother and I arguing about how to handle her

13

> because she was throwing things out of the house and it was an awful situation. My dad had called me and I had went over there. And so that's why the police ended up there. So then when I called the doctor I told them that he needs to help me because he prescribed these meds to her, we don't know what's wrong with her, I can't get a control on her, she can't get a control on herself. So he was the one who had the police force her to either go with them to the hospital or to have an ambulance come, and she chose to get in the police car and go—go then.

R. 72-74. In addition, Dr. Mueller's treatment notes after this time period later repeatedly include the following statement that presumably references this same incident: "domestic dispute hearing voices, throwing things, Swedes er admitted to swedes inpt psych."[9] R. 439.

The ALJ did not mention this incident in the decision. Perhaps even more surprising, neither did plaintiff in her briefs. It was also not mentioned in the treatment notes from Dr. Afzal and Dr. Buyan-Dent either. It is not clear why this seemingly important piece of evidence was not mentioned by these people. As noted above, Dr. Mueller, Dr. Freeman, and plaintiff's daughter all referred to it. It is possible that the underlying records from this hospitalization were not included in the administrative record for some reason. This Court did not come across them. In any event, at a minimum, the factual details about this incident need to be developed. If Dr. Freeman's summary is indeed accurate, then this information is important because it provides a fuller—and more ominous—picture of plaintiff's psychological problems.

The final topic to be discussed is the ALJ's main credibility rationale. The ALJ found that plaintiff and her daughter testified inconsistently with each other about exactly when plaintiff began using a cane. After reading the ALJ's summary and then comparing it to the testimony set forth in the hearing transcript, the Court is not even sure it can understand exactly what is supposed to contradictory. But even assuming there were a contradiction, the ALJ should have at

---

[9] Interestingly, right after this sentence, Dr. Mueller also included in his notes the following response from plaintiff: "I never had hallucinations, and most everything in that report is a lie." R. 439. Although one reference is too cryptic to draw any firm conclusions, this suggests that plaintiff may have been in denial about this incident and may not have mentioned it to her later doctors, thus raising a question about the adequacy of her insight into own condition.

14

least considered two mitigating facts. First, plaintiff and her daughter testified in 2018 about events taking place roughly 10 to 12 years earlier. (Plaintiff was 63 years old when she testified.) Second, she was suffering from memory problems caused by her Huntington's disease. *See, e.g.*, R. 774.[10] Given these facts, it would not be surprising if the recollection of these two witnesses did not match perfectly. Moreover, one could argue that the decision to use a cane, perhaps sporadically at first and then slowly increasing over time, is not a decision that has a definitive starting time that is easy to remember over a decade later.

In sum, although a few other issues were raised in the briefs, the Court finds that the above concerns are clearly enough. On remand, the ALJ should call a medical expert and more fully develop the record.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and this case is remanded for further consideration.

Date: September 28, 2020              By: _____
                                          Iain D. Johnston
                                          United States Magistrate Judge

---

[10] As plaintiff points out in her brief, she was asked at the hearing when she was born and seemed unsure of the day, guessing that it was either July 7th or July 20th. R. 51. Her birthday is actually July 28th.